COURT OF APPEALS
DECISION
DATED AND FILED

June 24, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP2428**

STATE OF WISCONSIN

Cir. Ct. No. 2024ME309

IN COURT OF APPEALS
DISTRICT II

IN THE MATTER OF THE MENTAL COMMITMENT OF T.R.A.:

WINNEBAGO COUNTY,

    PETITIONER-RESPONDENT,

  V.

T.R.A.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Winnebago County: DANIEL J. BISSETT, Judge. *Affirmed*.

¶1    GUNDRUM, J.[1]  T.R.A., referred to herein by the pseudonym Taylor, appeals from a circuit court order extending his involuntary commitment, pursuant to WIS. STAT. § 51.20, for twelve months.[2]  He contends Winnebago County (the County) failed to present sufficient evidence to prove he is currently dangerous under § 51.20(1)(a)2. and the court failed to make specific factual findings on dangerousness with reference to a subdivision paragraph of § 51.20(1)(a)2. as required by *Langlade County v. D.J.W.*, 2020 WI 41, ¶40, 391 Wis. 2d 231, 942 N.W.2d 277.  For the following reasons, we affirm.

## BACKGROUND

¶2    At the hearing on the County's extension of commitment petition, Dr. Michael Vicente, the medical director and staff psychiatrist from Winnebago County Department of Human Services, testified that he conducted an in-person examination of Taylor on April 8, 2025, and reviewed Taylor's treatment records. Vicente stated that Taylor suffers from schizophrenia, and he agreed Taylor's condition includes substantial disorder of thought, mood and perception that grossly impair his judgment, behavior, and capacity to recognize reality, and "[u]nder severe circumstances," his ability to meet the ordinary demands of life.

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24).  All references to the Wisconsin Statutes are to the 2023-24 version.

[2] Taylor also appeals a related circuit court order allowing for the involuntary administration of medication and treatment during the time of his extended commitment. Because he does not raise any argument specific to his involuntary medication and treatment order, however, we need not and do not address it.  *See Doe 1 v. Madison Metro. Sch. Dist.*, 2022 WI 65, ¶35, 403 Wis. 2d 369, 976 N.W.2d 584 (stating that appellate courts "do not step out of [their] neutral role to develop or construct arguments for parties" (citation omitted)).

¶3    Vicente indicated that Taylor "had displayed some paranoid ideation and delusional thoughts, particularly about prior treatment providers, also the police department." He explained that Taylor experienced "legal problems" in connection with a salesperson at Spectrum, because Taylor "believed that they had set him up and were trying to sell him on more things." Taylor informed Vicente that in connection with this incident, "the police had tazed him three times … for no reason."

¶4    Taylor also had relayed to Vicente

> that when he [Taylor] was incarcerated he feared that jail staff and other inmates were going into his cell, so he would do things. He told me he had made a rope out of a shirt … to protect himself and was ready to fight. So put himself in a dangerous situation and put others in danger due to his paranoid thoughts.

Vicente believed Taylor created a "[d]angerous situation to both [Taylor] in provoking the other people and putting the other people in danger because he created his own weapon against them." Vicente believed this incident occurred in December 2024.

¶5    Vicente stated that while Taylor had not made "any suicidal comments to" him, "he has made some subtle comments in the past that have led to previous detentions." When Vicente discussed those comments with Taylor, Taylor "minimized them."

¶6    Vicente testified that there are no alternatives to psychotropic medications for Taylor's condition. Taylor is currently prescribed Invega Sustenna, which "[h]e has done well [on] in the past," adding that "there was a period of about seven years where he hadn't had any legal problems or hospitalizations when he was taking medications regularly." However, Taylor

currently "does not believe he has an illness so he does not believe he needs the medication," and he did not produce himself for his most recent scheduled injection. Vicente explained that Taylor has "had a repeated pattern of after stabilization, believing he doesn't need medication, going off medication, then having a decompensation, which either led to hospitalization or other legal issues."

¶7 Vicente agreed that Taylor had "demonstrated a substantial probability that he needs care or treatment to prevent further disability or deterioration." Relatedly, Vicente reiterated that Taylor "was previously being treated and taking his medication regularly. There were no incidents of going to the hospital or any interactions with the law. He had stopped treatment … in 2023. And since that time there's been this decompensation with the recent legal problems and paranoid ideation."

¶8 Vicente agreed there was a substantial probability "that if left untreated [Taylor] would lack the services necessary for his health or safety," elaborating that "the delusional beliefs and his inability to care for himself and then not trusting people. He, for instance, wound up in a homeless shelter in South Dakota after he absconded from Wisconsin." Vicente agreed "there [is] a substantial probability that if left untreated, [Taylor] would suffer severe mental, emotional, or physical harm resulting in his loss of ability to function independently within the community" and that such "would be likely to impact his cognitive control over his thoughts and actions." Vicente indicated that Taylor had "clearly stated he would not" avail himself of reasonable provisions for treatment if they were made available in the community.

¶9 On cross-examination, Vicente testified that with regard to the Spectrum incident, Taylor "believed he was provoked." Vicente testified that it

was his understanding that in addition to rolling up a t-shirt "to make a rope" as a makeshift weapon, according to Taylor, he "had also at one time used a dinner tray and had broken some glass." Vicente acknowledged that he did not have any evidence of Taylor actually using these latter items "against … anybody in particular." Vicente agreed that it was his opinion that the e., or fifth, standard of WIS. STAT. § 51.20 applied in this case.

¶10 In his report, which was admitted into evidence at the hearing, Vicente provides additional insight into Taylor's condition.

> [Taylor] has a history of mental health needs since 1993. He has had hospitalizations at Mercy Medical, Winnebago Mental Health, Fond du Lac Health Care Center, etc. [Taylor] has a history of not taking medications and becoming dangerous when not on a commitment with medication order due to poor insight into his mental health care needs and status. Previously [Taylor] was on a commitment from 6/8/13 with extensions through 5/23/23. His current commitment stemmed from being at Winnebago County Jail for various charges and decompensating while in custody. [Taylor] had threatened deputies, broken a window in his cell, was refusing to come out of his cell, threatened staff with a lunch tray and knotted shirt and believed that others were attempting to harm him or poison him with gas while incarcerated. Additionally when hospitalized [Taylor] was refusing medications and medical clearance[.] Historically when [Taylor] is no longer on commitment he discontinues medications and treatment, resulting in decompensation and dangerousness. [Taylor] has indicated if he was not on commitment he would not take medications, and continues to indicate he does not believe he has a mental illness.

The report continues:

> While under [prior] commitment [Taylor] required hospitalization and/or crisis bed stabilization when he was not medication compliant and decompensated mentally. When his commitment was allowed to expire, [Taylor] discontinued services and medications[.] This resulted in [Taylor] losing his job, housing, and eventually resulted in [Taylor] having increased contacts with law enforcement

including new criminal charges. While incarcerated [Taylor] denied mental health care needs and continued to decompensate in the jail to the point a Chapter 51 was initiated.

¶11 Vicente's report identifies various criminal charges against Taylor, including criminal damage to property, disorderly conduct, resisting or obstructing an officer, and two bail jumping counts all occurring around the time of his December 2024 emergency detention. The report also identifies charges of taking and driving a vehicle without owner's consent, theft, fraud on a taxicab driver, disorderly conduct, and bail jumping all from fall of 2023. The report further explains that in August 2023, "after discharging from services on 06/29/2023," Taylor apparently had "[driven] around WI for a few days, spent some time in MN with an ultimate plan to make it to Colorado Springs," but "had some car issues in SD, spent a few nights at two homeless shelter[s] but he did not like the rules." He "complained of physical health ailments and was transported by police to the ER and ended up on the behavioral health unit."

¶12 According to the report, during Vicente's examination of Taylor, Taylor "talked about paranoid ideation about the employee at Spectrum, the police who tazed him three times without cause, the police at jail, and prior treatment providers." The report also states that Taylor "threatened jail staff while incarcerated, broke a window and TV's in the jail, attempted to harm staff with a knotted shirt, and believed others were trying to harm him or poison him with gas. He presented as paranoid, and was unable to meet his basic needs."

¶13 Following the hearing, the circuit court found that Taylor is suffering from a major mental health condition, schizophrenia, and "is a proper subject for treatment and is currently in need of treatment." The court further found that "there's a substantial probability that [Taylor] needs care or treatment to prevent

further deterioration" as "when [Taylor] has been off his medications in the past, … he has decompensated and has experienced various legal issues and hospitalizations. But [in general] when he has been on his psychiatric treatment and medication that he has done well."

¶14    The circuit court further determined that

> because [Taylor] does not believe that he has a mental health condition that he would not follow through with treatment if it was not [c]ourt-ordered or required and that there is a substantial probability that if he was left untreated, that he will lack the services necessary for his health or safety and will suffer severe mental, emotional, or physical harm that will result in loss of ability to function independently in the community.

The court found that Vicente "explain[ed] the advantages, disadvantages, and alternatives of the psychotropic medication to [Taylor]" and based on Vicente's testimony, Taylor "is not competent to refuse the psychotropic medication, that he's not able to make an informed decision as to his understanding or ability to apply those advantages, disadvantages to his mental health condition to make an informed decision as to whether to accept or refuse those medications." The court extended Taylor's commitment for one year and ordered the involuntary administration of medication and treatment during that time. Taylor appeals.

## DISCUSSION

¶15    An individual is a proper subject for recommitment under WIS. STAT. § 51.20(1) if the County proves by clear and convincing evidence that the individual is mentally ill, a proper subject for treatment, and dangerous to himself or others. *Langlade County v. D.J.W.*, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277; § 51.20(1)(a), (13)(e). Of these three, Taylor only challenges the circuit court's determination that he is dangerous, so that is our focus.

7

¶16    Whether the County met its burden of proof to support Taylor's recommitment presents a mixed question of law and fact. *See Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. "[W]e will uphold a circuit court's findings of fact unless they are clearly erroneous," ***D.J.W.***, 391 Wis. 2d 231, ¶24, and "we accept reasonable inferences from the facts," ***Winnebago County v. Christopher S.***, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). Whether the facts satisfy the statutory standard, however, is a question of law we review independently. ***D.J.W.***, 391 Wis. 2d 231, ¶25; ***Outagamie County v. Melanie L.***, 2013 WI 67, ¶39, 349 Wis. 2d 148, 833 N.W.2d 607. As the one appealing the court's orders, Taylor has the burden to show that the court erred. *See **Gaethke v. Pozder***, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381.

¶17    To support a commitment order, a circuit court need only conclude that the person is dangerous under one of the five dangerousness standards of WIS. STAT. § 51.20(1)(a)2. *See **Sauk County v. S.A.M.***, 2022 WI 46, ¶5, 402 Wis. 2d 379, 975 N.W.2d 162 ("If the government presents clear and convincing evidence that the committed person remains mentally ill, treatable, and dangerous under one of the five standards ... then the court must order that person recommitted ...."). Here, the court concluded Taylor is dangerous under the fifth standard, § 51.20(1)(a)2.e., "by way of the recommitment alternative" § 51.20(1)(am).[3] *See*

---

[3] WISCONSIN STAT. § 51.20(1)(am) provides, as relevant:

> [I]f the individual has been the subject of outpatient treatment for mental illness … immediately prior to commencement of the proceedings … the requirement[] of a … pattern of recent acts or omissions under [subpara.] e. … may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.

*S.A.M.*, 402 Wis. 2d 379, ¶32.  To establish dangerousness under the "long and complex" fifth standard by way of § 51.20(1)(am), the County must establish five elements.  *State v. Dennis H.*, 2002 WI 104, ¶¶16, 18, 255 Wis. 2d 359, 647 N.W.2d 851.  First, it must show "proof of a substantial probability of a 'loss of [Taylor's] ability to function independently in the community or the loss of cognitive or volitional control over his … thoughts or actions.'"  *See id.*, ¶20 (quoting § 51.20(1)(a)2.e.).  This is "a heightened standard of impairment—beyond the threshold definition of mental illness."  *Dennis H.*, 255 Wis. 2d 359, ¶20.

¶18    Second, the County must establish that Taylor is "incompetent to make medication or treatment decisions, or, more specifically, [he is] unable, 'because of mental illness,' to make 'an informed choice as to whether to accept or refuse medication or treatment.'"  *See id.*, ¶21 (quoting WIS. STAT. § 51.20(1)(a)2.e.).  "This must be evidenced ["after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained to him"] either by an 'incapability of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives,' or by a 'substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives to his … mental illness.'"  *Id.*, (quoting § 51.20(1)(a)2.e.).

¶19    Third, the County must establish a substantial probability that Taylor "'needs care or treatment to prevent further disability or deterioration' … 'demonstrated by both [his] treatment history and his … recent acts or omissions.'"  *See id.*, ¶22 (quoting WIS. STAT. § 51.20(1)(a)2.e.).  Because this is a recommitment, the County can establish "the requirement[] of … recent acts or omissions" "by a showing that there is a substantial likelihood, based on

[Taylor's] treatment record, that [he] would be a proper subject for commitment if treatment were withdrawn." *See* § 51.20(1)(am). Fourth, the County must establish that Taylor "evidence[s] a 'substantial probability that he … will, if left untreated, lack services necessary for his … health or safety.'" ***Dennis H.***, 255 Wis. 2d 359, ¶23 (quoting § 51.20(1)(a)2.e.). Finally, the County must establish that Taylor "evidence[s] 'a substantial probability that he … will, if left untreated, … suffer severe mental, emotional, or physical harm that will result in the loss of [his] ability to function independently in the community or the loss of cognitive or volitional control over his … thoughts or actions.'" ***Id.***, ¶24 (quoting § 51.20(1)(a)2.e.).

¶20 On appeal, Taylor insists the evidence before the circuit court was insufficient to establish current dangerousness under WIS. STAT. § 51.20(1)(a)2.e. He claims "the incident at Spectrum was pre-commitment behavior that alone—without additional support—is insufficient to support a substantial probability that [he] would be a proper subject for commitment if treatment were withdrawn." To begin, the incident at Spectrum does not stand "alone" as the only evidence, as will be detailed below. Moreover, while the incident is lacking in many specifics that could be helpful to our review, it is undisputed that police "tazed him three times" in connection with the incident. While we do not know precisely why the police took this action, it would be a reasonable inference that Taylor was engaging in some sort of threatening behavior for the police to have taken such an aggressive measure as tazing him.

¶21 While Taylor acknowledges that "the jail incident may have … justif[ied a finding of] dangerousness in the initial commitment—making Taylor a proper subject for commitment," he asserts that this "does not mean it [does so] now seven months later." However, because this is a recommitment, the County

can establish the requirement of recent acts "by a showing that there is a substantial likelihood, based on [Taylor's] treatment record, that [he] would be a proper subject for commitment if treatment were withdrawn." *See* WIS. STAT. § 51.20(1)(am). The reason for this is that the treatment ordered in an initial commitment may be working, so that the individual is no longer exhibiting any recent acts demonstrating dangerousness while being treated. *See Winnebago County v. S.H.*, 2020 WI App 46, ¶9, 393 Wis. 2d 511, 947 N.W.2d 761 ("[Section] 51.20(1)(am) 'recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior.'" (quoting *Portage County v. J.W.K.*, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509)).

The aim of § 51.20(1)(am) is simply

> to avoid the "revolving door" phenomena whereby there must be proof of a recent overt act to extend the commitment but because the patient was still under treatment, no overt acts occurred and the patient was released from treatment only to commit a dangerous act and be recommitted … [in] a vicious circle of treatment, release, overt act, recommitment.

*S.H.*, 393 Wis. 2d 511, ¶9 (quoting *State v. W.R.B.*, 140 Wis. 2d 347, 351, 411 N.W.2d 142 (Ct. App. 1987)).

¶22 We noted in *S.H.* that "evidence of dangerous postcommitment behavior [by Sarah was] lacking." *S.H.*, 393 Wis. 2d 511, ¶13 n.6. Nonetheless, we concluded that Sarah's belief that she did not need medication and the fact she had "'gone off medications' when not involuntarily committed, leading to 'hospitalizations and further commitment'" together with "Vicente's[4] unrebutted

---

[4] Michael Vicente also was the psychiatrist who testified in *S.H.*

11

discussion of his history treating Sarah (including her postcommitment paranoid ideations related to a precommitment incident in which she brought a baseball bat to work) support a finding that Sarah engages in dangerous behavior when not on medication." *Id.*, ¶15. We further noted that the circuit court "necessarily credited Vicente's prediction that there is a 'very high likelihood' that Sarah would again discontinue medication without a commitment order. Therefore, Vicente's testimony 'connected the dots,' supporting the court's final determination that Sarah would repeat this cycle (end of commitment/going off medication/dangerous behavior/recommitment) if her commitment order were not extended." *Id.* We stated that "[w]e cannot say that these factual findings are clearly erroneous." *Id.*

¶23 We relied on the fact that

> Vicente brought up a specific prior instance of dangerous behavior that was directly tied to postcommitment paranoid ideations relating to the same incident, and that resurfaced following a change in medication. This provided the necessary link between past dangerousness and the substantial likelihood of reoccurrence of such behavior absent an extension order ….

*Id.*, ¶17. We explicitly held that "as a matter of law, [the court's] factual findings satisfy the 'dangerousness' requirement of WIS. STAT. § 51.20(1)(am)." *S.H.*, 393 Wis. 2d 511, ¶16. We concluded, "Sarah does not believe that she is mentally ill; when given the choice she has repeatedly opted to discontinue medication, leading to dangerous (*albeit unspecified*) behavior requiring recommitment. Her history thus supports the court's ultimate conclusion that Sarah 'would be a proper subject for commitment if treatment were withdrawn.'" *Id.*, ¶16 (emphasis added; citation omitted).

¶24 We explained that "the appropriate inquiry involves a fact-intensive weighing of the evidence so as to arrive at an educated conclusion as to the likelihood of reoccurring dangerousness." *Id.*, ¶13 n.6. In this case, Taylor's paranoia has led him to threatening and dangerous conduct far more specific and detailed than the conduct supporting the determination of Sarah's dangerousness.

¶25 Like Taylor, Sarah challenged the circuit court's determination that she was dangerous under WIS. STAT. § 51.20(1)(am), specifically asserting that, as we phrased it, "the County cannot prove dangerousness unless it 'specif[ies] or elaborate[es] on which type of dangerous acts, omissions, or behaviors she would engage in' if treatment were withdrawn, with reference to the[] statutory standards. Sarah argue[d] that the County's failure to do so constitutes reversible error." *S.H.*, 393 Wis. 2d 511, ¶12 (first and second alteration in original). We rejected Sarah's strict standard, like the standard Taylor here would have us impose. We stated that

> neither the statute nor the applicable case law requires an expert or circuit court to speculate on the precise course of an individual's impending decompensation by identifying specific *future* dangerous acts or omissions the individual might theoretically undertake without treatment…. Dangerousness in an extension proceeding can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions (provided, of course, that there is a proper foundation for the latter).

*Id.*, ¶13.

¶26 Here, Vicente testified that, based upon Taylor's treatment history, he does well when he is medicated, but when he is not, he decompensates. As Vicente stated in his report,

> [Taylor] has a history of not taking medications and becoming dangerous when not on a commitment with

13

medication order due to poor insight into his mental health care needs and status…. His current commitment stemmed from being at Winnebago County Jail for various charges and decompensating while in custody. [Taylor] had threatened deputies, broken a window in his cell, was refusing to come out of his cell, threatened staff with a lunch tray and knotted shirt and believed that others were attempting to harm him or poison him with gas while incarcerated…. [Taylor] has indicated if he was not on commitment he would not take medications, and continues to indicate he does not believe he has a mental illness.…

....

While under commitment [Taylor] required hospitalization and/or crisis bed stabilization when he was not medication compliant and decompensated mentally. When his commitment was allowed to expire, [Taylor] discontinued services and medications[.] This resulted in [Taylor] losing his job, housing, and eventually resulted in [Taylor] having increased contacts with law enforcement including new criminal charges.…

.…

[Taylor] threatened jail staff while incarcerated, broke a window and TV's in the jail, attempted to harm staff with a knotted shirt, and believed others were trying to harm him or poison him with gas. He presented as paranoid, and was unable to meet his basic needs.

¶27     Here, evidence of Taylor's dangerousness was greater than that of Sarah. It included evidence that Taylor had to be "tazed … three times" by police due to his handling of an interaction with a Spectrum salesperson, threatened jail staff while incarcerated, including "attempt[ing] to harm staff with a knotted shirt" and "threaten[ing] staff with a lunch tray," and breaking a window in his cell. Add in his delusional beliefs that persons were trying to poison him with gas while he was incarcerated, and his dangerousness becomes abundantly clear.

¶28     The evidence was uncontroverted and sufficient that when not under treatment and medicated, Taylor decompensates, becomes delusional and out of

touch with reality, and engages in aggressive behavior demonstrating a willingness to engage in physically damaging behavior and violence towards others. When he is medicated, Taylor does better and does not present such a threat. It does not matter that such incidents took place months before the recommitment hearing, if it is shown, as it was, that there is a substantial probability that he will again engage in dangerous behavior if not treated/medicated.

¶29 Taylor asserts that "[u]ltimately, the County does not provide the necessary link between past dangerousness and the substantial likelihood of recurrence of such behavior absent an extension order." But the link is there, as Vicente explained that Taylor does well when medicated, and in the past when he has come off of the commitment and stopped using medication, he has decompensated and again made himself a proper subject for commitment. Moreover, contrary to Taylor's criticism, the circuit court need not "explain *what specifically* the harm would be." Rather, considering the presented evidence, the court must "arrive at an educated conclusion as to the likelihood of reoccurring dangerousness." *Id.*, ¶13 n.6. The court did that here, and relatedly, the County put forth sufficient evidence for recommitment.

¶30 Taylor also asserts the circuit court did not satisfy the requirement of our supreme court in *D.J.W.*, 391 Wis. 2d 231, ¶45, of, as Taylor writes it, "specific factual findings with reference to a subdivision paragraph of [WIS. STAT.] § 51.20(1)(a)2." Taylor must be reading a different record from this court, because the circuit court here specifically referenced paragraph e., the fifth standard, of § 51.20(1)(a)2. in both its ruling at the recommitment hearing, and its

written order.[5]  Furthermore, the court referred back to Vicente's presented evidence, noting the evidence that Taylor "do[es] well" "when he has been on his psychiatric treatment and medication," but when "off his medications in the past, … he has decompensated and has experienced various legal issues and hospitalizations."  The court clearly found Vicente credible and referred back to his testimony

> that because [Taylor] does not believe that he has a mental health condition that he would not follow through with treatment if it was not [c]ourt-ordered or required and that there is a substantial probability that if he was left untreated, that he will lack the services necessary for his health or safety and will suffer severe mental, emotional, or physical harm that will result in loss of ability to function independently in the community.

The court also referred back to Vicente's testimony, "based on [his] review of [Taylor's] treatment history and some recent acts or omissions, that there's a substantial probability that [he] needs care or treatment to prevent further deterioration."  In sum, the court sufficiently met the requirements of *D.J.W.*

*By the Court.*—Orders affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[5] At the hearing, the circuit court stated: (1) "[t]he doctor did testify that he felt that the fifth or (e) standard was met in this case"; (2) "[a]nd therefore that (e) standard or fifth standard is appropriate in this case"; and (3) "[a]nd I, again, will find that specifically the (e) standard applies."  Indeed, Taylor's counsel at the hearing clearly recognized, after noting Vicente's report and testimony, that "the (e) standard" is "the standard they think that recommitment is necessary under."  The written order refers only to the fifth standard, WIS. STAT. § 51.20(1)(a)2.e., and goes through the elements of that standard.